**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **GUY E. FRANKLIN,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 1:23-cv-00040-KD-C** |
| | ) | |
| **AUSTAL USA, LLC,** | ) | |
| **Defendant.** | ) | |

## <u>ORDER</u>

This action is before the Court on the Motion for Summary Judgment as to the claims of Plaintiff Guy E. Franklin ("Franklin"), (Doc. 66), and the Brief in Support, (Doc. 67), filed by Defendant Austal USA, LLC ("Austal"); the Response, (Doc. 74), filed by Franklin; and Austal's Reply, (Doc. 77). This action involves the claims of numerous Plaintiffs under a variety of theories regarding Austal's vaccine mandate during the COVID-19 pandemic. This order addresses the claims of **Plaintiff Guy E. Franklin**. Upon consideration, and for the reasons below, the motion is **GRANTED**.

### I.      Findings of Fact[1]

### A.  Austal USA, LLC

Austal is a federal contractor as it contracts with the United States Navy to build ships. At all relevant times, Austal has had in place an Equal Employment Opportunity policy, which prohibits discrimination based on protected characteristics including religion. The policy directed employees who believed that they had been subjected to discrimination or harassment to report it to Human Resources. During the relevant time period, Rusty Murdaugh ("Murdaugh") was Austal's president; Mike Bell ("Bell") worked as Vice President of Operations; Sandra Koblas

---

[1] The "facts," as accepted at the summary judgment stage, "may not be the actual facts of the case." <u>Feliciano v. City of Miami Beach</u>, 707 F.3d 1244, 1247 (11th Cir. 2013).

("Koblas") was Vice President of Human Resources; Samuel Cordts ("Cordts") was Director of Health and Safety; Rodney Patrick was the Employee Relations Manager; Ryan Lee ("Lee") was Senior Manager of Training and Organizational Development; Bridget Jewett was a Human Resources Business Partner; and Jeanette Whatley was an Occupational Nurse Coordinator.

### B.  Franklin's Position at Austal

While at Austal, Franklin worked as an A-class electrician and a fiber optics technician. This position required Franklin to work regularly with others on his team or crew. Franklin also regularly attended start of shift meetings where he was around others.

### C.  COVID-19 Pandemic and Austal's Response

The World Health Organization ("WHO") declared COVID-19 as a pandemic on March 11, 2020. National Library of Medicine, https://pmc.ncbi.nlm.nih.gov/articles/PMC7569573/ (last visited Dec. 2, 2024). Austal was still considered an essential employer, given that it was charged with building ships for the United States Navy. As such, Austal provided to employees who had immune issues or otherwise had concerns regarding the pandemic with leave in the Spring of 2020. Austal, where possible, put into place social distancing requirements. Austal required employees to wear masks and provided masks to employees. Austal provided hand sanitizer to employees. Austal employed cleaning crews to perform extra cleaning, particularly in areas where an employee had tested positive for COVID-19. Austal tracked COVID-19 cases by work area in an effort to engage in contact tracing. Employees who tested positive for COVID-19, or who were exposed to COVID-19, were required to quarantine consistent with Centers for Disease Control ("CDC") requirements.

### D. Federal COVID-19 Vaccine Mandate and Austal's COVID-19 Vaccine Mandate

On September 9, 2021, President Joe Biden signed Executive Order 14042 ("EO 14042"). See Ensuring Adequate COVID Safety Protocols for Federal Contractors, 86 FR 50985 (Sep. 9, 2021). EO 14042 established a requirement that all federal contractor employees be vaccinated. Id. EO 14042 directed the Federal Workforce Task Force to develop workplace COVID-19 safety standards with which federal contractors governed by the EO would have to comply. Id. In turn, the Task Force issued guidance on September 24, 2021, requiring the contractors to mandate that their employees be fully vaccinated (meaning, two weeks after receiving the Johnson & Johnson/Janssen vaccine or the second dose of the Pfizer or Moderna vaccine) by December 8, 2021, unless granted an exemption. New Guidance on COVID-19 Workplace Safety for Federal Contractors, WHITE HOUSE https://www.whitehouse.gov/omb/briefing-room/2021/09/24/new-guidance-on-covid-19-workplace-safety-for-federal-contractors/ (last visited Dec. 3, 2024).

On or about November 5, 2021, the Occupational Safety and Health Administration ("OSHA") issued an Emergency Temporary Standard ("ETS") that would require employers of 100 or more employees to perform periodic testing of unvaccinated employees. See COVID-19 Vaccination and Testing; Emergency Temporary Standard, 86 FR 61402 (Nov. 5, 2021). That ETS was ultimately withdrawn by OSHA in January 2022. See COVID-19 Vaccination and Testing; Emergency Temporary Standard, 87 FR 3928-01 (Jan. 26, 2022).

Shortly before entry of EO 14042, Austal implemented a mandatory vaccination policy for Austal's leadership, which required those employees to be vaccinated by October 8, 2021. The October 8, 2021, deadline was later extended to align with the federal mandate of EO 14042.

On October 1, 2021, Austal issued a communication to its workforce regarding the federal mandate. In that communication, employees were informed that Austal was subject to the federal

mandate and that all employees were required to receive and report receipt of the Johnson & Johnson/Janssen vaccine or their first shot of the Pfizer or Moderna vaccine by October 27 and the second doses of the Pfizer or Moderna vaccine by November 24. In that same communication, Austal informed its employees that any employee who had a disability, who was pregnant, who was a nursing mother, who had a qualifying medical condition contraindicating vaccination, or who objected to being vaccinated on the basis of a sincerely-held religious belief/practice could request an exemption from the vaccination.

Austal hosted onsite vaccination clinics on October 7, 8, 14, 15, 21, 22, 26, and 27 in an effort to assist employees in obtaining the vaccination. On October 5, 2021, Austal provided employees with specific instructions on how to request an exemption. The internal deadline set for the submission of religious exemption requests was October 15, 2021.

Austal also required unvaccinated workers—but not vaccinated employees—to wear masks. And Austal allowed only vaccinated employees to wear stickers indicating that they were vaccinated.

### E. Accommodation/Exemption Process for Religious Exemptions

Human Resources provided each employee requesting an exemption with a request form. The form asked the employee to provide information about the religious belief precluding vaccination, including whether a pastor or minister could be contacted. Austal did not question or analyze whether an employee had a sincerely held religious belief. In other words, Austal assumed that the stated belief was sincerely held and proceeded to the undue hardship analysis.

As part of the evaluation process, Human Resources met with each employee's management/supervisory team to discuss the employee's job interactions with others (such as co-

workers, managers, and customers). The information gathered was used to determine what, if any, safety protocols the employee would have to follow if his/her request for exemption was granted.

### F. Franklin's Requests for Accommodation/Exemption

Franklin completed a religious exemption form. Franklin was not given any specific guidance from a pastor or spiritual leaders suggesting that he should not take the COVID-19 vaccine. Ultimately, Franklin was informed that his request for religious exemption was not granted. Franklin does not recall discussing the vaccination mandate with anyone besides his wife, brother, dad, and possibly his pastor. (Doc. 64-1 at 24, 26).

### G. Austal's Attempts to Accommodate

In total, Austal received almost 160 religious exemption requests. Human Resources interviewed the management/supervisory teams of all employees but determined that no employee worked in isolation and that each employee had regular interactions with other employees.

Lee sought health and regulatory guidance on how to preserve employee safety and health if they were not vaccinated. Lee consulted with medical and health personnel both at the University of South Alabama and the Mobile County Health Department. Through those discussions, and in consideration of the anticipated OSHA ETS, Austal determined that unvaccinated employees would be required to submit to bi-weekly onsite testing provided by Austal, as well as continued masking and social distancing where possible.

In an effort to evaluate the feasibility of a bi-weekly onsite testing program, Austal assessed the cost, mechanics, and logistics of how the program would work for the nearly 160 employees requesting religious exemptions—while bearing in mind that Austal could not require employees to pay for their own tests. Lee assembled a spreadsheet that took into account the cost of the test itself, the fact that the employees would be on-the-clock for the approximate thirty minutes of

testing, the costs of administrative labor in supervising and tracking testing, and the projected costs of false positives that would mandate added testing utilizing a medical services vendor and employee time off work. Lee and Austal took into account that administration of the testing program would require, among other things, additional reporting to check the shift/status/attendance of the unvaccinated employee, communications with the employee's supervisor, managing potential non-compliance with testing requirements, preparing tests and testing sites, witnessing tests, and logging and tracking test results.

Based on the calculations, Austal was facing an approximate cost in excess of $1,000,000.00 per year to perform bi-weekly testing, aside from the administrative costs. In consideration of this estimate, the potential administrative issues, and the obligation to protect the health of its employees, Austal determined that a bi-weekly testing program would pose a significant undue hardship on the company and that there was no other feasible method to accommodate those seeking religious exemptions from the vaccine requirement. Austal looked at what it could accommodate and granted some medical exemptions but denied all religious exemptions. Austal did not meet with any of the employees requesting a religious exemption before denying their requests.

### H. Franklin's Termination and Lawsuit

On or about October 22, 2021, a Human Resources representative spoke with employees who requested religious exemptions and let them know that their request could not be approved. Each employee was reminded that they had until October 27, 2021, to provide proof of vaccination.

On October 26, 2021, Austal communicated with all employees from whom it did not have proof of vaccination. Austal asked those who had chosen to not get vaccinated to inform their Human Resources representatives promptly so that plans could be made for separation of

employment at the end of their shift on October 27, 2021. Austal offered administrative leave for October 28–29, 2021, for employees who remained undecided about vaccination. These employees were required to provide proof of vaccination by October 31, 2021. Austal would then process terminations of any employees who did not verify proof of vaccination by November 1, 2021. No one told Franklin that he was being terminated because of religion.

Franklin's operative complaint alleges (1) that Austal was negligent in the way it handled the COVID-19 pandemic; and (2) that Austal invaded his privacy by inquiring about his vaccination status. (Doc. 24).[2] Franklin's operative complaint does not allege a Title VII reasonable accommodation claim against Austal.

## II.    Standard of Review

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome" of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," a genuine dispute of material fact exists. Id.

The party moving for summary judgment "bears the initial burden of demonstrating the absence of a genuine dispute of material fact." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011). The movant meets this burden by identifying affirmative evidence (pleadings, depositions, answers to interrogatories, admissions on file, etc.) to support its claim that no genuine dispute of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c)(1)(A). If the nonmovant bears the burden of persuasion at trial, the movant may also make a prima facie showing of summary judgment by demonstrating that the

---

[2] The Court previously adopted the Report and Recommendation of the Magistrate Judge, (Doc. 51), which dismissed the remaining counts of the amended complaint. (Doc. 53).

nonmovant's evidence is insufficient to establish an essential element of its claim. <u>Grange Mut. Cas. Co. v. Slaughter</u>, 958 F.3d 1050, 1057 (11th Cir. 2020); Fed. R. Civ. P. 56(c)(1)(B).

If the movant meets its burden under Rule 56(c), summary judgment will be granted unless the nonmovant offers some competent evidence that could be presented at trial showing that there is a genuine dispute of material fact. <u>Celotex</u>, 477 U.S. at 324. If the movant met its burden by pointing "to specific portions of the record . . . to demonstrate that the nonmoving party cannot meet its burden of proof at trial," the nonmovant must "go beyond the pleadings" to designate specific facts showing a genuine issue for trial. <u>Id.</u>; Fed. R. Civ. P. 56(e).

When assessing a summary judgment motion, the court's function is not to make "credibility determinations" and "weigh the evidence." <u>Anderson</u>, 477 U.S. at 248. Instead, the court must "view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." <u>FindWhat</u>, 658 F.3d at 1307. Thus, summary judgment is only proper when a movant shows that no reasonable jury could find for the nonmovant—even when the evidence and inferences are drawn in the nonmovant's favor.

### III.    Analysis

Franklin alleges two causes of action against Austal: (1) negligent handling of the COVID-19 pandemic and (2) invasion of privacy. (Doc. 24). Austal moves for summary judgment as to all of Franklin's claims.

Franklin concedes that his negligence claim is "due to be dismissed." (Doc. 74 at 9). Therefore, summary judgment is **granted** in favor of Austal as to Franklin's claims for **negligence**. The remaining question is whether summary judgment is proper on the invasion of privacy claim.

**A. Invasion of Privacy**

"Alabama has long recognized that a wrongful intrusion into one's private activities constitutes the tort of invasion of privacy." Butler v. Town of Argo, 871 So. 2d 1, 12 (Ala. 2003). Invasion of privacy consists of four distinct wrongs: (1) intrusion on seclusion; (2) public disclosure of private information; (3) false light; and (4) appropriation for commercial use. Id. Franklin argues that he has a claim for the second form: public disclosure of private information which violates ordinary decency. (Doc. 74 at 5).[3]

Franklin contends that Austal publicly disclosed his private information regarding his vaccination status in two ways. *First*, by requiring unvaccinated employees—but not vaccinated employees—to wear masks. *Second*, by allowing only vaccinated employees to wear stickers.

Public disclosure of private information is an actionable tort when the matter publicized is of a kind that: "(a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public." Ex parte Birmingham News, Inc., 778 So. 2d 814, 818 (Ala. 2000) (quoting Restatement (Second) of Torts § 652D (1977)). Austal argues that Franklin's public disclosure theory regarding his vaccination status fails on both elements.

*First*, Austal argues that the disclosure of Franklin's vaccination status was not highly offensive to a reasonable person because Franklin openly discussed his vaccination status to others, including those at work. In support, Austal cites Hill v. Branch Banking & Tr. Co., 264 F. Supp. 3d 1247, 1267 (N.D. Ala. 2017) (granting summary judgment for employer on invasion of privacy claim because plaintiff publicly discussed the information in question with her coworkers). *Second*, Austal argues that the COVID-19 pandemic and the vaccine were matters of public concern.

---

[3] Franklin concedes that he does not have a viable claim under the first, third, and fourth forms. (Doc. 74 at 5).

In response, Franklin provides four reasons why he believes Austal invaded on his privacy. *First*, his invasion of privacy is specific to him. *Second*, Austal did not provide specifics as to the timing of Franklin's alleged disclosures. *Third*, it is not clear whether Franklin discussed his vaccination status with only those already aware of it or with those who had prior knowledge. *Fourth*, there was not a legitimate health interest in disclosing Franklin's vaccination status.

Franklin also cites Horne v. Patton: "When a patient seeks out a doctor and retains him, he must admit him to the most private part of the material domain of man. Nothing material is more important or more intimate to man than the health of his mind and body." 287 So. 2d 824, 830 (Ala. 1973) (quoting Hammonds v. Aetna Casualty & Surety Co., 243 F. Supp. 793, 801 (N.D. Ohio 1965)). Franklin's reliance on this quote, however, is misguided. Horne, and the case Horne quoted, involved a doctor revealing information that the plaintiff provided to the doctor during treatment. See Horne, 287 So. 2d at 825; Hammonds, 243 F. Supp. at 795. Here, Austal does not have the same doctor–patient relationship with Franklin. Moreover, the Horne court explained that "[i]f the defendant doctor in the instant case had a legitimate reason for making this disclosure under the particular facts of this case, then this is a matter of defense." Horne, 287 So. 2d at 831.

Franklin is correct that there are material issues of fact concerning whether he openly discussed his vaccination status with coworkers. The evidence does not definitively show that Franklin "publicly discussed" his vaccination status with his coworkers. (Doc. 64-1 at 24, 26).; cf. Hill v. Branch Banking & Tr. Co., 264 F. Supp. 3d 1247, 1267 (N.D. Ala. 2017) (plaintiff publicly discussed the topics of the invasion of privacy claim). Therefore, the issue is whether Austal had a legitimate reason for disclosing Franklin's vaccination status under the facts of the case.

The Second Restatement of Torts provides: "When the subject-matter of the publicity is of legitimate public concern, there is no invasion of privacy." Restatement (Second) of Torts § 652D

(1977). For example, in <u>Middlebrooks v. State Board of Health</u>, an Alabama law required the disclosure of information regarding HIV and AIDS patients, including names and addresses of persons infected. <u>Middlebrooks v. State Bd. of Health</u>, 710 So. 2d 891, 891 (Ala. 1998). The Alabama Supreme Court explained that the disclosure of this information was not an invasion of privacy because "the prevention of the spread of HIV and AIDS is a legitimate governmental interest." <u>Id.</u> at 892–93.[4]

Franklin argues that Austal did not have a legitimate interest in knowing his vaccination status for two reasons. *First*, "the vaccine does not prevent an individual from getting COVID, nor does it prevent an individual from spreading COVID." (Doc. 74 at 8). Franklin quotes a CDC article which states that "[v]accines are not always effective at preventing infection . . . ." and clarifies that the "purpose of the vaccine" is to provided sustained protection against disease and death. <u>5 Things You Should Know about COVID-19 Vaccines</u>, CDC (Oct. 13, 2023, 2:00 PM), https://www.cdc.gov/ncird/whats-new/5-things-you-should-know.html (last visited Dec. 4, 2024). *Second*, Austal's mask policy of only requiring the unvaccinated to wear masks is contrary to OSHA guidance. Franklin quotes a Frequently Asked Questions ("FAQs") webpage from OSHA

---

[4] The Alabama Supreme Court relied on the <u>Westinghouse</u> factors from a Third Circuit case to determine that the disclosure was justified. <u>Middlebrooks</u>, 710 So. 2d at 891. In <u>Westinghouse</u>, the court explained:

> The factors which should be considered in deciding whether an intrusion into an individual's privacy is justified are the type of record requested, the information it does or might contain, the potential for harm in any subsequent nonconsensual disclosure, the injury from disclosure to the relationship in which the record was generated, the adequacy of safeguards to prevent unauthorized disclosure, the degree of need for access, and whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access.

<u>United States v. Westinghouse Electric Corp.</u>, 638 F.2d 570, 578 (3d Cir.1980).

which states: "In areas with substantial or high transmission, employers should provide face coverings for all workers, as appropriate, regardless of vaccination status." Frequently Asked Questions, OSHA https://www.osha.gov/coronavirus/faqs (last visited Dec. 5, 2024). For the same reasons, Franklin argues that Austal had no legitimate interest in knowing who was required to wear a mask through its sticker policy.

Franklin's arguments concerning Austal's interest in its mask and sticker policy are not persuasive. To start, the CDC article upon which Franklin relies was published in October 2023, and there is no date associated with the OSHA FAQ webpage. Therefore, these sources do not prove that Austal lacked a legitimate interest in its mask and sticker policy at the time in question. More importantly, the sources do not support Franklin's argument. For example, the OSHA FAQs guide employers to "provide" masks for all workers, "regardless of vaccination status." Frequently Asked Questions, supra. They also note that employers "can suggest or require" that (1) unvaccinated individuals wear masks in public workplaces and that (2) all individuals wear masks in public, indoor settings of high transmission. Id. But it does not support Franklin's argument that employers lack a legitimate interest in requiring unvaccinated workers to wear masks. Furthermore, the latter half of the CDC article quoted by Franklin explains that "there is extensive data showing that these vaccines prevent severe illness and protect the public's health." 5 Things You Should Know about COVID-19 Vaccines, supra.

To determine whether Austal's mask and sticker policy was of legitimate public concern, the Court must balance the competing interests of Austal and Franklin. Austal had an interest in maintaining the health and safety of its workforce. Austal's actions were based on the obvious risks of COVID-19, objective data, and federal mandates regarding vaccinations. On the other hand, Franklin desired to remain unvaccinated and to keep his vaccination status private. At the

time, the prevention and spread of COVID-19 was, as a matter of law, a matter of public concern. Austal relied on objective data to determine that vaccinations and masking would protect its interests, and the interests of its employees. The potential harm to Franklin—the fact that other employees could infer that Franklin was unvaccinated—does not outweigh the public interest in requiring unvaccinated workers to wear masks. Therefore, summary judgment is **granted** in favor of Austal as to the **invasion of privacy claim**.

## IV.    Conclusion

Franklin alleges two causes of action against Austal: (1) negligent handling of the COVID-19 pandemic and (2) invasion of privacy. Franklin concedes that his negligence claim is due to be dismissed. Moreover, no reasonable jury could find in favor of Franklin on his invasion of privacy claim. Therefore, summary judgment is **granted** in favor of Austal as to all of Franklin's claims.

**DONE** and **ORDERED** this **3rd** day of **January 2025.**

 /s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**